UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROYAL CONSUMER PRODUCTS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 18 C 4695 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| WALGREEN CO., | ) | |
| | ) | |
| Defendant. | ) | |

**M<span></span>EMORANDUM O<span></span>PINION AND O<span></span>RDER**

Royal Consumer Products LLC alleges in this diversity suit that Walgreen Co. breached contracts under which Walgreen purchased private-label (that is, Walgreen-branded) poster board from Royal by (1) improperly discontinuing future orders and (2) underpaying Royal for fulfilled orders. Doc. 1. Walgreen moves under Civil Rule 12(b)(6) to dismiss the claim regarding the discontinuance of future orders. Doc. 16. The motion is granted. Walgreen also moved under Rule 12(b)(1) to dismiss the underpayment claim on the ground that dismissing the discontinued-orders claim would defeat subject matter jurisdiction, *ibid.*, but its reply brief correctly withdraws that motion, Doc. 25 at 10.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Royal's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings."

1

*Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Royal as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage, the court does not vouch for their "objective truth." *Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

Royal is a paper products manufacturer that supplies private-label paper products to retailers. Doc. 1 at ¶ 1. From 2013 through 2017, Walgreen—which operates a national pharmacy store chain—repeatedly ordered private-label poster board from Royal to be sold at Walgreen's stores. *Id*. at ¶¶ 2, 5, 15. Terms governing the transactions were set forth in a General Trade and Electronic Data Interchange Agreement ("GTA"). *Id*. at ¶ 5; Doc. 1-1. The GTA incorporated a second agreement, the Terms and Conditions of Electronic Data Interchange, which set forth procedures for electronically transmitting certain documents, such as purchase orders and sales forecasts. Doc. 1 at ¶¶ 11, 13; Doc. 1-1 at pp. 6-10.

The GTA provides that it "sets forth the terms and conditions under which the parties agree to facilitate their purchase and sale transactions." Doc. 1-1 at 2. The GTA further provides that, with certain exceptions not relevant here, "[t]he terms and conditions contained [in the GTA] shall apply to all merchandise … sold by Vendor [Royal] … to Walgreen." *Ibid*. Additional terms of the GTA are referenced below in the Discussion section. The GTA does not specify any kind or quantity of goods Walgreen would or was required to order from Royal.

Walgreen provided Royal with sales forecasts for the products that Royal supplied. *Id*. at ¶¶ 9, 13. Royal told Walgreen that it would rely on those forecasts in ordering raw materials and building an inventory of private-label products. *Id*. at ¶ 9. Royal also told Walgreen that to adjust its production schedule and ensure that it maintained a sufficient inventory of private-label

poster board, it would need 120 days' notice of any changes in the set of products that Walgreen ordered, including any decision to switch to a different supplier. *Id*. at ¶¶ 9-10. Royal alleges that Walgreen agreed to provide 120 days' notice of product set or supplier changes. *Id*. at ¶ 10. Royal does not allege that this 120-day notice agreement was set forth in writing in the GTA or any other contract, *id*. at ¶¶ 9-10, and in fact the GTA includes no such provision, Doc. 1-1.

Walgreen ordered private-label poster board from Royal about every one or two weeks from September 2013 through May 2017. Doc. 1 at ¶ 15. On May 22, 2017, Walgreen notified Royal that it was changing its poster board supplier and would not order from Royal after September 2017. *Id*. at ¶¶ 17, 19. Walgreen also notified Royal that it was discontinuing the private-label poster board that Royal supplied. *Ibid*. Royal alleges that Walgreen's notice was not in the format required by the agreed-upon electronic data transmission procedures. *Id*. at ¶ 21.

Royal stopped producing the private-label poster board on May 22, 2017, and Walgreen did not place orders after that date. *Id*. at ¶¶ 22-23. Royal alleges that because Walgreen did not provide sufficient notice that it was changing suppliers, Royal was left with "a substantial inventory" of private-label poster board. *Id*. at ¶¶ 24-25. Royal spent $82,419.40 to remove the Walgreen private-label markings from that inventory so that it could return the product to its regular stock. *Id*. at ¶ 26.

Royal also alleges that Walgreen breached the parties' contracts by underpaying Royal $20,278.73 for fulfilled orders. *Id*. at ¶¶ 28-33.

## Discussion

Walgreen moves to dismiss Royal's discontinued-orders claim, arguing that Walgreen was never required to order anything under the GTA and thus cannot have breached the GTA by

refusing to order more poster board. Doc. 17 at 6-9. Royal responds that the GTA was either a requirements contract or an irrevocable option contract under which Walgreen had to continue purchasing private-label poster board from Royal unless it gave 120 days' notice of its intent to discontinue the orders. Doc. 22 at 3-13.

The GTA's choice of law provision points to Illinois law, Doc. 1-1 at p. 4, § D(11), and in any event, the parties agree that Illinois law governs, Doc. 17 at 5, 8; Doc. 22 at 3. The court therefore applies Illinois law. *See Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 704-05 (7th Cir. 2004) (noting that, "[i]n a diversity case, the federal court must apply the choice of law rules of the forum state to determine applicable substantive law," and that "Illinois respects a contract's choice-of-law clause as long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy").

"The basic rules of contract interpretation under Illinois law are well settled. In construing a contract, the primary objective is to give effect to the intention of the parties." *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 689-90 (7th Cir. 2017). "A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Id*. at 690 (quoting *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007)). "Moreover, because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Gallagher*, 874 N.E.2d at 58. "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Right Field Rooftops*, 870 F.3d at 690 (quoting *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004)). By contrast, "[i]f the language of the contract is susceptible to

4

more than one meaning, it is ambiguous," and in that event "a court may consider extrinsic evidence to ascertain the parties' intent." *Gallagher*, 874 N.E.2d at 58.

Read as a whole, the GTA unambiguously does not require Walgreen to buy anything from Royal. Instead, the GTA is a master agreement setting out the terms under which Walgreen could buy goods from Royal whenever Walgreen chose to submit a purchase order and Royal chose to accept it. The GTA begins by stating that it "sets forth the terms and conditions under which the parties agree to facilitate their purchase and sale transactions" and that those terms and conditions "shall apply to all merchandise" (with certain exceptions not relevant here) "sold by [Royal] … to Walgreen." Doc. 1-1 at p. 2. The GTA contemplates that the parties' "purchase and sale transactions" will be conducted using purchase orders. For example, the GTA states:

> Vendor's performance shall be in accordance with these terms, dating and conditions. Any other terms in Vendor's acceptance are rejected unless agreed to in writing and signed by Walgreen's authorized representative. Walgreen shall pay item cost in effect as of the date of issue of Walgreen's purchase order, or as otherwise agreed to by the parties.

*Id*. at p. 2, § C(1). That provision contemplates that when Walgreen wants to order merchandise, it will do so by submitting a purchase order to Royal, which Royal may accept or reject, and that if Royal accepts the order, the resulting transaction will be governed by the GTA. *Ibid*. Moreover, in providing that "[n]either the merchandise described in any purchase order nor the terms set forth herein shall be modified in any way, except pursuant to a written instrument signed by an authorized officer of Walgreen," *id*. at p. 3, § C(8), the GTA draws a distinction between its function (setting out generally applicable terms) and the function of individual purchase orders (identifying the merchandise Walgreen will buy in a specific transaction). This understanding of the relationship between the GTA and individual purchase orders is confirmed by the GTA's other references to purchase orders. *See id*. at p. 2, § B(2) (referring to "invoices prepared in accordance with the terms of the purchase order"); *id*. at p. 2, § C(2) ("Walgreen may

5

return, at Vendor's expense, or cancel a purchase order, and receive a full refund for all merchandise in excess of that ordered or which is defective or tainted or which varies from the sample from which or specifications for which the purchase order was placed, or for Vendor's failure to comply with Walgreen's shipping or billing directions or with these terms including, without limitation, the representations and warranties contained herein."); *ibid*. (setting forth additional terms that apply "if a purchase order is designated as a 'Guaranteed Sale,' 'Sale and Return,' 'Sale or Return,' 'Consignment' or 'Vendor Returnable' transaction"). Nothing in the GTA requires Walgreen to submit any purchase orders. *See LifeWorks Tech. Grp. v. Walgreen Co.*, 295 F. Supp. 3d 884, 890 (N.D. Ill. 2018) (holding that a similar contract "permit[ted] Walgreen not to order any more goods from [the vendor] or accept goods already ordered—that is, to cancel any existing or future purchase orders").

Royal acknowledges that the GTA "lacks certain terms" that one would expect to find in a contract for the sale of goods, such as quantity, duration, and the goods to be sold. Doc. 22 at 3-4. Royal does not, however, draw the natural conclusion that a contract that does not say what goods will be sold, in what quantities, or at what prices, and that defers to not-yet-issued purchase orders for those essential details, Doc. 1-1 at p. 2, § C(1), is not, in fact, a contract for the sale of goods. Instead, Royal argues that Illinois's codification of the Uniform Commercial Code supplies the supposedly "missing" terms and makes the GTA a requirements contract under which Walgreen promised to buy from Royal all the private-label poster board it needed. Doc. 22 at 3-10.

In Illinois, "a requirements contract exists only when the contract (1) obligates the buyer to buy goods, (2) obligates the buyer to buy goods exclusively from the seller, and (3) obligates the buyer to buy all of its requirements for goods of a particular kind from the seller." *Brooklyn*

6

*Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 377-78 (7th Cir. 2000) (internal quotation marks omitted); *see also Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017) ("[R]equirements contracts … obligate a buyer to purchase all, or a substantial portion of, its requirements of specific goods or services from one supplier."). The GTA does not have any of those characteristics. As noted, the GTA does not obligate Walgreen to buy anything. Also, it does not require Walgreen to deal exclusively with Royal, and it refers generally to "merchandise," Doc. 1-1 at p. 2, not to any particular kind of goods—and certainly not to private-label poster board. Accordingly, the UCC gap-filling provision Royal invokes, 810 ILCS 5/2-306, does not apply. *See Brooklyn Bagel*, 212 F.3d at 379 (holding that 810 ILCS 5/2-306 does not apply to contracts without a "promise by the buyer to purchase all of its requirements, or at least a minimum quantity, from the seller"). The GTA therefore is not a requirements contract. *See id*. at 378 (holding that a contract providing that, "upon order by [Earthgrains], [Brooklyn Bagel] will process and pack the ordered quantity of [bagels]" and that Earthgrains would submit nonbinding quarterly forecasts of its "anticipated requirements" was "not a requirements contract[,] as it d[id] not expressly obligate Earthgrains to purchase all, or any specified quantity, of its requirements of bagels") (first two alterations in original).

      Royal responds that the GTA provision prohibiting it from "us[ing], sell[ing], or otherwise dispos[ing] of any merchandise or packaging that displays Walgreen's name or trademarks … without the prior written authorization of Walgreen," Doc. 1-1 at p. 2, § C(3), implies that Walgreen would buy poster board exclusively from Royal. Doc. 22 at 5, 9-10. That is incorrect; that provision restricts only what *Royal* can do with Walgreen-branded products, not from whom *Walgreen* can buy those products.

7

Royal next argues that the parties' alleged agreement—not alleged to have been set forth in writing in the GTA or any other contract—that Walgreen would provide 120 days' notice before "mov[ing] to a new supplier" implies that Royal would be Walgreen's exclusive supplier of private-label poster board. Doc. 1 at ¶¶ 9-10; Doc. 22 at 5. As Walgreen notes, however, the GTA has an integration clause stating that it "constitute[s] the complete Agreement of the parties" and "supersede[s] all prior representations or agreements," Doc. 1-1 at p. 5, § F(2). "Given such a clause, the parol evidence rule" precludes the court from considering extrinsic evidence "to discover the parties' genuine intent," unless the contract is ambiguous. *Brooklyn Bagel*, 212 F.3d at 380; *see also Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) ("If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence."). Because Royal "neither points to any contractual language that is reasonably susceptible to differing interpretations, nor suggests a void that cries out for an implied term," it cannot use the alleged 120-day notice agreement to transform the GTA into a requirements contract. *Brooklyn Bagel*, 212 F.3d at 380 (internal quotation marks omitted). In any event, even if the alleged 120-day notice agreement could be considered and even if Walgreen made an implied promise not to buy private-label poster board from other suppliers, Royal still could not show that Walgreen was required to buy anything at all. *See id*. at 377 (holding that a contract is a requirements contract only if it "obligates the buyer to buy goods") (internal quotation marks omitted).

Royal submits in the alternative that the GTA is a "buyer's option" that became irrevocable except on 120 days' notice when Royal "provided consideration by building and maintaining an inventory" of private-label poster board. Doc. 22 at 7. That argument, even if premised on a correct reading of the GTA, is self-defeating, for a buyer's option is a contract

8

under which the *buyer* has the option—but not the obligation—to purchase goods or services according to the contract's terms. *See Brooklyn Bagel*, 212 F.3d at 378-79 (holding that "the district court correctly characterized the [c]ontract as a 'buyer's option'" where the seller agreed to sell bagels to the buyer at a specified price, "which could only increase or decrease at six-month intervals," but the buyer "had no obligation to buy … any quantity" of bagels from the seller). Accordingly, even if the GTA were a buyer's option, Walgreen was never required to buy any poster board and thus cannot have breached the GTA by ceasing to do so.

Finally, Royal argues that even if Walgreen was not required to continue buying poster board, Walgreen breached its commitment to provide 120 days' notice before changing or discontinuing its purchases by failing to give notice on time and in the proper format. Doc. 22 at 10-13; Doc. 26 (Royal contending at oral argument that a defective notice would breach the contract even if Walgreen was not required to buy anything). That argument fails for two independent reasons. First, Royal identifies no ambiguity that would permit the court to consider extrinsic evidence demonstrating a 120-day notice requirement despite the GTA's integration clause. *See Brooklyn Bagel*, 212 F.3d at 380 (holding that the parol evidence rule barred extrinsic evidence of the parties' intent where the plaintiff did not point to any ambiguous language in the contract). Second, even if the GTA required 120 days' notice, the lack of any requirement that Walgreen buy poster board in the first place means that Walgreen still was not required to buy poster board during the 120-day notice period. *See id*. at 381 (holding that the buyer did not breach a contract provision requiring ninety days' notice of termination when it stopped ordering bagels from the seller less than ninety days after giving notice, reasoning that nothing in the contract obligated it to order bagels during the notice period). And because the only harm Royal allegedly suffered—the cost of removing Walgreen's branding from poster

9

board that was already in its inventory when Walgreen gave notice, Doc. 1-1 at ¶¶ 23-26—resulted not from any defect in Walgreen's notice, but from Walgreen's lack of any obligation to buy poster board during the 120 days after it gave notice, Royal cannot prove damages resulting from any breach concerning the notice's timing or format, thus defeating any claim based on that breach.  *See Brooklyn Bagel*, 212 F.3d at 381; *see also Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018) (noting that "to prevail on a breach of contract claim the plaintiff must show … [that] damages resulted from the alleged breach of contract," and affirming summary judgment for the defendant where the plaintiff failed to explain what damages she suffered as a result of the alleged breach).

Royal's claim regarding Walgreen's discontinuance of its private-label poster board orders is therefore dismissed.  As Walgreen recognized in withdrawing its Rule 12(b)(1) motion, Doc. 25 at 10, dismissing that claim does not affect the court's jurisdiction over the underpayment claim even though the dismissal reduces the amount in controversy to below the jurisdictional threshold.  *See Smith v. Greystone All., LLC*, 772 F.3d 448, 450 (7th Cir. 2014) ("[A] district judge cannot decide the merits of one claim, whittle down the amount in controversy, and then dismiss the suit as below the minimum for the diversity jurisdiction of 28 U.S.C. § 1332."); *Johnson v. Wattenbarger*, 361 F.3d 991, 993-94 (7th Cir. 2004) (same).

## Conclusion

The motion to dismiss is granted in part and withdrawn in part.  Royal's claim regarding Walgreen's decision to stop ordering private-label poster board is dismissed.  Because the unambiguous language of the parties' contracts would make any amendment futile, the dismissal is with prejudice.  *See Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 855 (7th Cir. 2017) ("[D]istrict courts have broad discretion to deny leave to amend … where the amendment

would be futile.") (internal quotation marks omitted). In any event, Royal's opposition brief does not request a chance to replead in the event its claim is dismissed or suggest how amendment would cure the defects resulting in dismissal, which provides a separate ground for entering a with-prejudice dismissal. *See Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 335 (7th Cir. 2018) ("Nothing in Rule 15, nor in any of our cases, suggests that a district court must give leave to amend a complaint where a party does not request it or suggest to the court the ways in which it might cure the defects. To the contrary, we have held that courts are within their discretion to dismiss with prejudice where a party does not make such a request or showing."). This case will proceed on the underpayment claim.

April 15, 2019                                      United States District Judge